467 F.2d 1
 69 Lab.Cas. P 13,035
 Anna Mae BRYANT etc., et al., Appellants,
v.
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al.,
Appellees.
Della Sue RICE, etc., Appellant,
v.
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al.,
Appellees.
 Nos. 72-1075, 72-1153.
 United States Court of Appeals,
 Sixth Circuit.
Sept. 26, 1972.
 
 Charles Allen Williams, Paducah, Ky., for appellants; Beard, Rummage & Kamuf, Owensboro, Ky., on brief.
 Harrison Combs, Washington, D. C., for appellees; Edward L. Carey, Washington, D. C., Grant F. Knuckles, Pineville, Ky., Albert W. Spenard, Madisonville, Ky., James U. Smith, Jr., James M. Graves and Edw. H. Stopher, Boehl, Stopher, Graves & Deindoerfer, Louisville, Ky., on brief.
 Before PHILLIPS, Chief Judge, and CELEBREZZE and KENT, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 On August 8, 1968 an explosion rocked the Peabody Coal Company's River Queen Mine #1 in Muhlenberg County, Kentucky, killing nine miners. The explosion which took the lives of those men also precipitated a number of lawsuits; these appeals grow out of two of these suits.
 
 
 2
 After initiating procedures for such recovery as is permitted under Kentucky's Workmen's Compensation law, the representatives of the estates of eight of the dead miners brought actions in the United States District Court against both the Peabody Coal Company and the International Union, United Mine Workers of America. Plaintiffs' complaints pointed out that the Coal Company and the Union had signed a collective bargaining agreement in which they incorporated a document known as the Federal Mine Safety Code. That Code set down minimum health and safety standards for mines and was designed for the use of federal inspectors during their observations of coal mines. Plaintiffs' complaints contended that the Company obligated itself to conform to the Code's standards and that the Union undertook a duty to enforce such compliance. It was further asserted that both the Company and the Union failed to perform their respective duties, leading to the foreseeable result that plaintiffs' decedents, beneficiaries of the contract were killed as a consequence of practices which were in violation of the Code.
 
 
 3
 The District Court rejected plaintiffs' claims and granted summary judgment in favor of both the Coal Company and the Union. Plaintiffs have accepted the District Court's decision with respect to the Coal Company and on appeal contest only that part of the District Court's judgment as denied them relief against the Union.
 
 
 4
 Appellants assert that theirs is an action grounded in Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, that is an action designed to remedy a breach of a collective bargaining agreement. Language in their complaint suggests, however, that this may also be viewed as a suit seeking recompense for the Union's breach of its duty of fair representation. See Goldberg, J., concurring in Humphrey v. Moore, 375 U.S. 335, 351, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). We do not believe that either of these claims can withstand close scrutiny.[1]
 
 
 5
 When examined with care it is clear that neither the collective bargaining agreement in general[2] nor the "Safety Program" section specifically relied upon by appellants created any duties, breach of which could give rise to liability of the sort appellants seek to fasten upon the Union. The text of the safety program section is set out in full in the margin.[3] We need comment on only two aspects of that program: The general provisions relating to code compliance [sub-sections (a) and (b)] and the authorization for mine inspections contained in sub-section (e). In examining these sections it must be remembered that the substantive law to be applied is federal in nature, derived from the policy of the national labor laws. See Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). So far as possible the courts must seek to advance, not retard those national labor policies in construing the collective bargaining agreements which come before them.
 
 
 6
 Sub-section (a) of the Safety Program adopts by reference the Federal Mine Safety Code as part of the collective bargaining Agreement. The Code, promulgated by the Secretary of the Interior in 1953, provides minimal safety standards for the guidance of federal mine inspectors. Sub-section (b) is labeled "Enforcement" and sets forth the manner in which the Code may be enforced under the Agreement. It limits such enforcement to situations where a violation of the Code has been found by a federal mine inspector and the inspector has issued recommendations for curing the violations. In such cases the mine operator is bound to comply with the recommendations promptly. Presumably in the event of non-compliance the Union could process the matter through normal grievance procedures. No federal inspector's report of violations or recommendations was offered into evidence below nor is there any suggestion that such report existed. Thus the prerequisite to the assumption of any possible enforcement obligation under the contract was lacking in this case.
 
 
 7
 Further, we are far from convinced that the contract necessarily makes the Union financially responsible for a failure to compel correction of Code violations even in situations where such violations have been reported by federal mine inspectors. Sub-sections (a) and (b) read together give the Union the power to compel compliance; nothing in the language of those sub-sections seems to require the Union to exercise such power. Collective bargaining agreements are literally agreements between unions and employers; the Union negotiators are intent on gaining the maximum power possible from management negotiators. Whether or not they choose to exercise all the power gained depends on a variety of situations relating to the overall employment situation in the industry. It would be a mistake of vast proportion to read every power granted the union by management as creating a corollary contract right in the employee as against the union. Such interpretation of collective bargaining agreements would simply deter unions from engaging in the unfettered give and take negotiation which lies at the heart of the collective bargaining agreement.
 
 
 8
 Of course the Union is not without responsibility toward its members with regard to the safety program. Quite apart from obligations created directly by the collective bargaining agreement itself any exclusive bargaining representative has a duty to fairly represent the members of its bargaining unit. This duty includes the obligation to enforce fairly the provisions of any collective bargaining agreement. See Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Such duty is breached when the Union in bad faith acts or fails to act for reasons which are arbitrary or discriminatory. See Humphrey v. Moore, Vaca v. Sipes, supra. While it was alleged that the United Mine Workers failed to enforce compliance with safety rules because of a conspiracy with the River Queen's operator the evidence introduced below showed no sign whatever of such conspiracy and failed even to show that Union officials had any knowledge of any Code violation at all. Under such circumstance there can be no basis for a finding that the Union breached its duty of fair representation.
 
 
 9
 In addition to their main argument directed toward the nonenforcement of the Safety Code itself appellants also assert that the Union breached its obligations under the collective bargaining agreement by failing to make periodic inspections of the mine. It is asserted that such inspection obligation was created by the terms of sub-section (e) of the Safety Program section.
 
 
 10
 There can be no doubt that subsection (e) does provide for a union role in dealing with safety at the mine. It indicates that a mine safety committee shall be established at each mine with members selected from among the ranks of the union local representing a particular facility.[4] Such committee was established and functioning at the River Queen Mine. The sub-section also provides that among other powers the committee "may inspect any mine development or equipment. . . ." It is apparently contended that this language places a duty to inspect upon the local and International Unions. We do not accept this contention. The use of the permissive "may" rather than obligatory language in the clause clearly negatives the possibility that any duty was to be created. No liability can be predicated upon the language of sub-section (e).
 
 
 11
 This Court is not unfamiliar with the difficult and longstanding problem of ensuring safety in the coal mines of this country. We recognize the harsh plight of those who have lost the family bread-winner through the all too frequent intervention of mining disaster. The answer to their problem is not to pervert the collective bargaining process by reading into its instruments a liability which was never contemplated and duties which were never assumed in fact or in theory. To saddle labor unions with liability for the mine operators' failure to comply with standards introduced into the contract at the union's bidding would simply be to discourage the inclusion of similar or more effective standards in later contracts. Such result would not serve the interest of miners and would retard rather than advance the goals of the National Labor policy.[5]
 
 
 12
 Since we do not find the Union to have breached any duty created by the collective bargaining agreement or by the obligation of fair representation we must conclude that it is without liability to appellants.
 
 
 13
 Accordingly, the judgment below is affirmed.
 
 
 
 [1]
 It is somewhat problematic whether appellants have the standing to bring this suit. While the Supreme Court has clearly established the right of individual employees to sue to enforce certain particularized rights granted them under collective bargaining agreements, it has indicated that not all rights created or duties assumed under a collective bargaining agreement may be subject to enforcement through a suit by an individual under Sec. 301. See Smith v. Evening News, 371 U.S. 195, 200-201, 83 S.Ct. 267, 9 L.Ed.2d 246; cf. Brown v. Sterling Aluminum Products Corporation, 365 F.2d 651, 657 (8th Cir. 1966) cert. den. 386 U.S. 957, 87 S.Ct. 1023, 18 L.Ed.2d 105, reh. den. 386 U.S. 1027, 87 S.Ct. 1370, 18 L.Ed.2d 471. Whether standing exists in a particular case turns upon the nature of the right or duty which the individual seeks to enforce. See Smith, supra 371 U.S. at 201, 83 S.Ct. 267, n. 9; Brown v. Sterling Aluminum Products Corp., supra. When, as here, the asserted right and/or duty is completely illusory, resolution of the standing problem is extremely difficult. Further this case comes to us in an unusual stance with only the Union surviving as defendant. In view of these circumstances, rather than add to the muddle which surrounds the standing question, see Falsetti v. Local Union #2026 U.M.W., 335 F.2d 658, 660-661 (3d Cir. 1966) we have refrained from passing on this issue which was not raised by the parties. We assume without deciding that, for the purposes of this decision only, the requisite standing can be said to exist
 
 
 [2]
 The Agreement is formally known as the "National Bituminous Coal Wage Agreement of 1950 as Amended Effective April 1, 1966."
 
 
 [3]
 "National Bituminous Coal Wage Agreement of 1950 as amended September 29, 1952," the "National Bituminous Coal Wage Agreement of 1950," and all previous Agreements as therein provided, such amendments, modifications and supplements being as follows, to wit:
 MINE SAFETY PROGRAM
 Amend the "MINE SAFETY PROGRAM" section of the Agreement by striking out all of the language and inserting in lieu thereof the following:
 "(a) Mine Safety Code
 "The Federal Mine Safety Codes for Bituminous Coal and Lignite Mines of the United States, Part I-underground mines and Part II-strip mines, promulgated and approved October 8, 1953, by the Secretary of the Interior are hereby adopted and incorporated by reference in this contract as a code for health and safety in bituminous and lignite mines of the parties of the first part.
 "(b) Enforcement
 "(1) Reports of the federal coal mine inspectors: Whenever inspectors of the United States Bureau of Mines, in making their inspections in accordance with authority as provided in Public Law 49 and Public Law 552 find there are violations of the Federal Mine Safety Code and make recommendations for the elimination of such noncompliance, the operators shall promptly comply with such recommendations, except as modified in paragraph two of this subsection.
 "(2) Whenever either party to the contract feel that compliance with recommendations of the federal mine inspectors as provided above would cause irreparable damage or great injustice, they may appeal such recommendation to the Joint Industry Safety Committee as hereinafter provided.
 "(c) Review and Revision
 "In order to carry out the intent and purposes of the agreement affecting the Federal Mine Safety Code it is agreed that representatives of the United Mine Workers of America and the coal operators signatory hereto shall hold joint consultations with the United States Bureau of Mines looking toward review and appropriate revision of the Federal Mine Safety Code. Any revised code that is agreed upon between the aforementioned parties, when adopted by the parties, shall be adopted and incorporated by reference into this Agreement in place of the code adopted and incorporated in the National Bituminous Coal Wage Agreement of 1950 and continued under this agreement.
 "(d) Joint Industry Safety Committee
 "There is hereby established under this agreement a Joint Industry Safety Committee composed of four members, two of whom will be appointed by the Mine Workers and two of whom will be appointed by the operators, whose duty it shall be to (1) arbitrate any appeal which is filed with it by any operator or any mine worker who feels that any reported violations of the code and recommendation of compliance by a federal coal mine inspector has not been justly reported or that the action required of him to correct the violation would subject him to irreparable damage or great injustice; and (2) to consult with the United States Bureau of Mines in accordance with the provisions of Section (c) above.
 "(e) Mine Safety Committee
 "At each mine there shall be a mine safety committee selected by the local union. The committee members while engaged in the performance of their duties, with the following exception, shall be paid by the local union. When the mine safety committee is making an investigation of an explosion and/or a disaster, they shall be paid by the company at their regular rate of pay for the hours spent making such investigation, provided there is not more favorable local agreement or practice already in effect. The committee at all times shall be deemed to be acting within the scope of their employment in the mine within the meaning of the Workmen's Compensation law of the state where such duties are performed.
 "The mine safety committee may inspect any mine development or equipment used in producing coal. If the committee believes conditions found endanger the life and bodies of the mine workers, it shall report its finding and recommendations to the management. In those special instances where the committee believes an immediate danger exists and the committee recommends that the management remove all mine workers from the unsafe area, the operator is required to follow the recommendation of the committee.
 "If the safety committee in closing down an unsafe area acts arbitrarily and capriciously, members of such committee may be removed from the committee. Grievances that may arise as a result of a request for removal of a member of the safety committee under this section shall be handled in accordance with the provisions providing for settlement of disputes.
 "The safety committee and operators shall maintain such records concerning inspections, findings, recommendations, and actions relating to this provision of the agreement as may be required, and copies of all reports made by the safety committee shall be filed with the operators.
 "(f) The International Union, United Mine Workers of America, may designate memorial periods not exceeding a total of ten (10) days during the term of this agreement, provided it shall give proper notice to each district."
 
 
 [4]
 The International Union suggests that sub-section (e) is completely irrelevant to it because the sub-section involves the local union only. It asserts that such local was a completely separate entity and the actions and duties of such local could not be imputed to the International. In view of the reading given sub-section (e) in the text we need not reach this contention
 
 
 [5]
 We do not consider the effect of a resolution adopted by the Union which provides as follows:
 Each district representative shall know the Federal Mine Safety Code and be made fully responsible for compliance with its various provisions by the various miners within his assigned jurisdiction.
 The text of such resolution, while appearing in an interrogatory was never brought to the attention of the District Court in the complaints, the memoranda or the oral arguments which were presented to that Court. Further, appellants have consistently urged in this Court and below that theirs is an action based on the collective bargaining agreement. Obviously the resolution is not part of such agreement.